STATE OF MICHIGAN

IN THE 47th JUDICIAL DISTRICT COURT

COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN,

Circuit Court No.

20273785FH

v                                District Court No.

SCOTT ANDREW WITZKE,                19MH68430FY

Defendant.

_____/

<u>PRELIMINARY EXAMINATION</u>

BEFORE THE HONORABLE, DISTRICT JUDGE MARLA E. PARKER

Farmington Hills, Michigan - Friday, February 14, 2020

APPEARANCES:
For the People:           Beth M. Hand(P47057)
                          1200 N Telegraph Road
                          Pontiac MI 48341
                          (248)858-0656


For the Defendant:        John H. Holmes, Jr.
                          P.O. BOX 7011
                          Bloomfield Hills, MI 48302
                          (248)424-9394


RECORDED BY:              Anne Nelson, CER 7483
                          Certified Electronic Recorder
                          (248) 871-2986


TRANSCRIBED BY:           Anne Nelson, CER 7483
                          Certified Electronic Recorder
                          (248) 871-2986

1

TABLE OF CONTENTS

WITNESSES:  PEOPLE                                        PAGE

**Trooper Robert Allen McLean**

Direct Examination by Ms. Hand                            04

Cross-Examination by Mr. Holmes                           09

Redirect Examination by Ms. Hand                          21

WITNESSES:   DEFENDANT

None


EXHIBITS:                          OFFERED      ADMITTED

None

Farmington Hills, Michigan.

Friday, February 14,2019 9:56 a.m.

2

THE COURT: Calling case number 19MH68430 People versus Scott Witzke.

MS. HAND: Good morning, your Honor. Beth Hand appearing on behalf of the People.

MR. HOLMES: Good morning, your Honor. My name is Jack Holmes appearing on behalf of and with Scott Witzke who is present.

THE COURT: Thank you. This is the date scheduled for preliminary examination. Anything we need to address before we begin the exam?

MS. HAND: There is a stipulation for exam purposes only that the toxicology report did indicated that the substance seized did, in fact, test positive for the controlled substance methamphetamine.

MR. HOLMES: For preliminary exam purposes we will agree that the Court can consider that.

THE COURT: Thank you. I will note that stipulation. Anything further we need to address?

MS. HAND: No, your Honor.

THE COURT: Thank you. Then Counsel, you may call your first witness.

MS. HAND: Your Honor, People call Trooper McLean.

THE COURT: Sir, if you would come forward, please? And if you'd raise your right hand? Do you solemnly swear or affirm the testimony you are about to

give in this cause shall be the truth and nothing but the truth, so help you God?

    TROOPER MCLEAN: Yes, ma'am, I do.

    THE COURT: Have a seat, please.

    TROOPER ROBERT ALLEN MCLEAN

    (At 9:57 a.m. witness called and sworn and testified as follows)

DIRECT EXAMINATION

BY MS. HAND:

Q    Sir, please state your full name and spell your last.

A    Robert Allen McLean M-c-L-e-a-n.

Q    And you're a state trooper, obviously?

A    Yes, ma'am.

Q    Were you working in that capacity, sir, on July 30th of 2019?

A    I was.

Q    Did you have occasion to be in the area of the city of Farmington Hills?

A    I was.

Q    And were you on routine road patrol at that time?

A    I was.

Q    And did a – were you looking for a particular vehicle?

A    I was.

Q    What kind of vehicle were you looking for?

A    It was a blue Chevrolet, I believe, Impala.

Q    Okay. And did you observe the vehicle matching the
     description of the one you were looking for?

A    I did.

Q    All right. And did you have an opportunity to run the
     plate of the vehicle?

A    I did.

Q    And did the vehicle's plate have any status attached to it?

A    It was out of state rental with Pennsylvania plates came
     back with a return of stolen.

Q    Okay.

A    I had dispatch confirm that.

Q    All right. And did you execute a traffic stop on the
     vehicle?

A    I did.

Q    Approximately, where did that occur?

A    At approximately eastbound 696 and Orchard Lake.

Q    Okay. And did the vehicle -- did you activate your
     overhead lights?

A    I did.

Q    And did the vehicle immediately come to a stop?

A    On the left shoulder, yes, ma'am.

Q    Okay. And how many occupants in the vehicle were there?

A    Just one.

Q    Do you see that person in the courtroom today?

A    Yes, ma'am.

Q    Can you point to where they're seated and identify an item
     of clothing they're wearing?

A    The gentleman sitting over to my right.

Q    Okay. What is he wearing?

A    The far right with the glasses.

Q    What's he wearing?

A    Dark-framed glasses.

Q    What's he wearing?

A    Prison garb.

Q    Okay.

          MS. HAND: Your Honor, may the record reflect
     identification of the defendant?

          THE COURT: The record shall so reflect.

          MS. HAND: Thank you.

BY MS. HAND:

Q    And did you make contact with the driver of the vehicle?

A    I did.

Q    All right. And what, if anything, occurred at that point?

A    I confirmed his identity that he was the renter on the
     lease agreement. He verified that the vehicle was stolen
     and I placed him under arrest.

Q    Okay. He verified that the vehicle was stolen or you had
     already done that?

A    I did based on his name on the lease agreement and the
     lease agreement to the plate.

6

Q     Okay. Okay. And once he was placed under arrest did you
      --were you going to impound that vehicle?

A     At that point, I placed him in the front seat of my car
      and I had to do an inventory search and I was going to
      impound it.

Q     Okay. And what, if anything, sir, did you locate inside
      the vehicle?

A     Located a small bag filled with controlled substances in
      the trunk.

Q     Okay. And do you recall how those controlled substances
      were packaged?

A     There was two small containers. One had large chunks of
      meth, the second container had two small Ziploc style bags
      filled with powder. There was several syringes and some
      analogues.

Q     Okay. Were there any other officers on the scene at this
      point?

A     There was. With Michigan State Police I had four partners.

Q     Okay. And at some point what did you do with the drugs
      that you found?

A     At that point, I put them in the evidence bag and secured
      them in the trunk of my car.

Q     Okay. And who were they eventually turned over to?

A     To the Madison Heights surveillance team.

Q     Okay. Had you had information about this vehicle before

you stopped it?

A    I did.

Q    All right. And did you suspect it to be carrying controlled substances?

A    I did not.

Q    Okay. Once the controlled substances were found did you talk to the defendant?

A    I did.

Q    Prior to speaking with him did you advise him of his Miranda rights?

A    Yes, ma'am.

Q    And how did you go about doing that?

A    I read him his Miranda rights off of the department card and he exercised his rights to talk.

Q    Okay. So did he indicate to you he understood those rights?

A    He did.

Q    And he wished to speak with you?

A    Yes.

Q    And what, if anything, do you recall him saying?

A    He said that he's well trusted, he knows bigger people and he's going to miss the drop-off time and he was a little upset that he was going to miss the drop time.

Q    Drop time for what, sir?

A    To deliver drugs.

Q    Okay. And did he indicate to you what type of drugs he had?

A     I don't recall.

Q     Okay. And did he tell you where he was supposed to be
      delivering the drugs to?

A     To a hotel within the city of Madison Heights.

Q     Okay. Did he name the hotel, do you remember?

A     If I recall, The Red Roof Inn.

Q     Okay. All right. Thank you.

          MS. HAND: I have no further questions.

          THE COURT: Counsel, cross-examination?

          MR. HOLMES: Thank you, your Honor.

                CROSS-EXAMINATION

BY MR. HOLMES:

Q     Trooper, I want to go over a couple of answers that you
      gave during your direct testimony. I want to make sure I
      understood your answer regarding the question that Ms.
      Hand asked you. At the time you made the stop of this
      vehicle did you or did you not suspect there were
      controlled substances in it?

A     I did not. I don't recall that being in the notes. The
      vehicle had a stolen plate.

Q     And was that the reason that you understood that you were
      going to be stopping that car?

A     I was under the understanding that it was going to be a
      cold stop to verify that the vehicle was stolen and then
      go from there.

Q   And that's the only information you had prior to making the stop, is that right?

A   Yes, sir.

Q   Yes? Okay. Thank you. Did you receive this information through dispatch?

A   Through our dispatch, yes, sir.

Q   And where were you when you received that?

A   I was behind the wheel of my vehicle patrolling.

Q   Where was your car?

A   At this point, I was going eastbound 96 from Kensington Lake -- Kensington Road.

Q   From Kensington Road?

A   Yes.

Q   And you were in Oakland County at that time?

A   I was.

Q   And when you received the information from your dispatch were you directed to do something immediately or to wait?

A   Dispatch isn't going to direct me to make a stop. At that point, they gave me the information and my squad sergeant, Sergeant Dipietrio, told me to wait until we got closer to Orchard Lake because there's more cars in this area.

Q   And so far as you understand that was the reason that you were told to wait until this car got to Orchard Lake Road and 696, is that right?

A   Yes, sir.

Q    And there were other troopers and units with you at the
     time you made the stop?

A    There was.

Q    So they were immediately, is that correct?

A    Correct.

Q    Was there in-car video in your car?

A    There was.

Q    And what did you do with that video after the stop?

A    After the stop, I went back to the post where I
     transported the suspect; I pulled the memory card from the
     camera. I gave it to another squad sergeant and he
     downloaded the footage off that card to two discs which I
     handed over to the Madison Heights surveillance team.

Q    Okay. And that was the last you had it in your hand,
     correct?

A    Correct.

Q    As far as you know your system was working?

A    It was working.

Q    You mentioned a lease agreement that you apparently were
     aware of, is that correct?

A    Yes.

Q    Did that involve this car?

A    It did.

Q    Did you actually see a document that was a lease agreement
     or rental agreement for this car?

A     I don't recall. I just remember I had like a receipt
      --like the document invoice in my hand. I put that back on
      the seat when he gave me his license.

Q     So, Mr. Witzke gave you his license, correct?

A     Correct.

Q     And did he give you a document regarding the car itself?

A     I remember looking at an invoice that showed his name on
      the rental agreement.

Q     Do you know where that document came from?

A     I would have put it back in the vehicle.

Q     You put it back in the car?

A     Yes, sir.

Q     Did Mr. Witzke hand it to you?

A     I don't recall.

Q     Okay. You indicated that you did an inventory search of
      this car, correct?

A     Correct.

Q     Was that done at the roadside?

A     It was.

Q     Was it done before -- well, let me ask you this. Was the
      car taken into impound?

A     I have to do an inventory search before that's done.

Q     Is that part of your department procedure?

A     It is.

Q     Did you wait there until the car was taken into impound?

A    I had a partner wait for the tow. My partner stood by until the tow secured the vehicle and then continued on eastbound.

Q    And you took Mr. Witzke into your custody, is that right?

A    Correct.

Q    And the conversation you had with him did that occur inside your patrol vehicle?

A    Yes.

Q    And you gave him his Miranda warnings at that point?

A    Yes, sir.

Q    And he agreed to talk with you?

A    Yes, sir.

Q    Was that conversation recorded?

A    It was.

Q    Inside your car?

A    It was.

Q    And was that recording turned over to who? Madison Heights or someplace else?

A    No, Madison Heights.

Q    Same place as with the video -- in car video?

A    It would be on the same disc, sir.

Q    So same disc?

A    Yes, sir.

Q    All right. One would be outside view, one would be the inside view, is that right?

A    Correct.

Q    All right.  At the time you made the stop were you made aware of any of the circumstances involving this car?

A    At that time, not fully.

Q    Did you say "not fully"?

A    I was reading the notes. I was just told to make a cold stop so there are several teams that will identify and they ask for troopers to make cold stops to identify the driver. I didn't know the whole history behind the vehicle or the driver.

Q    Okay.

A    I just made the stop and he was the -- he was on the invoice for the rental that was stolen.

Q    Okay. And when you ran the LEIN that car came up stolen, correct?

A    Correct.

Q    Out of, I think you said, Pennsylvania?

A    It was an Ohio rental and the plates were Pennsylvania.

Q    Pennsylvania plates, Ohio rental?

A    Yes, sir.

Q    Where was Mr. Witzke when you made the inventory search of the car?

A    He was sitting in the front seat of my vehicle.

Q    And so he was secured, correct?

A    He was. He was seat belted and we have a seat belt lock on

the front seat.

Q   So, he couldn't get out of the car without your assistance, correct?

A   Correct.

Q   And so he had no access to the car itself, correct?

A   He did not.

Q   So, at that point, the only individuals having access to this car were you and your fellow troopers, correct?

A   Correct.

Q   When you made the stop on the car you did it in the normal way?

A   Yes, sir.

Q   You activated your lights and were behind it in some fashion, correct?

A   Correct. I called dispatch. I notified them that I was going to be making a traffic stop on the left shoulder of eastbound 696, east of Orchard Lake. And then I activated my lights, he slowed down and merged to the left shoulder. I came to a stop and made contact with him at the post.

Q   So he slowed down immediately as soon as you activated your lights, is that correct?

A   Correct.

Q   And you stopped him on the left shoulder?

A   Yes, sir.

Q   That was next to the median wall then?

15

A    Yes, sir.

Q    Is that the usual place that people stop?

A    No, typically they'll pull over to the right shoulder but I make a lot of my stops on the left shoulder.

Q    Any particular reason for that other than that's where people are?

A    It's just more from my patrol preference. Once I'm done with that stop then I can stay on the left shoulder and run radar or I can get back into traffic pretty easily.

Q    Okay. Even though there's not a lot of room on that left shoulder, correct?

A    Correct. That's just my preference.

Q    And that was the reason that this happened in this way, your preference?

A    Well, at this point, it wasn't -- it was early -- it was pre-rush hour and the other lanes had a lot of cars so instead of fighting across lanes and traffic to make a stop on the right shoulder I initiated the stop onto the left shoulder.

Q    Regarding the inventory search, were you the one who actually did the inventory search?

A    I did. I opened up the trunk and a partner of my mine, Trooper Donny DeSnyder, actually went to the trunk and discovered the bag and we opened it together.

Q    Tell me the name of the trooper again.

16

A   Trooper Donald DeSnyder. He's on the report as a secondary officer.

Q   And you opened the trunk and he was there, correct?

A   Yes, sir.

Q   And you both looked in the bag that you found?

A   Yes, sir.

Q   And was he also -- did he also assist you in searching the remaining area of the trunk?

A   Yes, sir.

Q   Did you find anything of evidentiary interest in the interior of the car?

A   I did not find anything in the driver's side and another trooper, Trooper Mark Pheney, inspected the passenger compartment and did not find anything.

Q   And you watched Trooper Pheney do that, correct?

A   Correct.

Q   And the back seat of the car, if there was one?

A   There was nothing discovered.

Q   Nothing there that you found?

A   No, sir.

Q   So the only evidence that you found was in the truck of the car, correct?

A   Correct.

                MR. HOLMES: One moment, your Honor, if I may?

                THE COURT: You may.

BY MR. HOLMES:

Q   Regarding the directions you received about making the
    cold stop did that come from your Michigan State Police
    dispatch?

A   It was.

Q   Were you aware of the origins of that request?

A   They advised me when they were entering the county and
    where they were at.

Q   And you, what? I didn't hear. I'm sorry.

A   They advised me -- dispatch advised me when they were
    entering into Oakland County. I was the nearest car at
    that time.

Q   So, okay. So, you were the nearest car. You were aware
    that the car that you were supposed to stop was coming
    from someplace else, is that right?

A   Correct.

Q   Did you know where it was coming from?

A   I did not.

Q   Did you know where the information was coming from that
    was relayed to you through your dispatch?

A   It was.

Q   I'm sorry?

A   I was.

Q   It was?

A   It was relayed from Madison Heights through Michigan State

emergency dispatch to me.

Q   So, you knew that Madison Heights had some involvement in this at that time?

A   Yes, sir.

Q   Did you know what that involvement was?

A   Outside of the stolen vehicle, no.

Q   And that was it? You thought your cold stop was regarding a stolen car?

A   Correct.

Q   And that was what you understood, is that right? Yes?

A   Yes.

Q   Okay. So once you made the stop and you turned everything over to Madison Heights how did you know to do that?

A   Their team showed up shortly thereafter we made the stop and then I got some of the back story and at this point we already found the bag of drugs.

Q   So the Madison Heights team showed up at the traffic stop on 696, is that right?

A   Correct.

Q   And you then learned that they were the ones that were giving information through state police dispatch?

A   Correct. Yes.

Q   And when you turned things over such as the video and did you turn over the controlled substances you found or suspected controlled substances?

A    I did. I turned over two containers of substances, two discs and then my incident number for the report.

Q    And that was turned over to Madison Heights?

A    It was.

Q    Was all that done on the roadside or at some later point?

A    Metro North Post.

Q    At your post?

A    Yes, shortly after the stop.

Q    Okay. Same day?

A    Same day.

Q    And did the Madison Heights people come and get that from you physically?

A    They had team members in our post waiting for the discs.

Q    So, when you got to the post people were there waiting for your materials, is that right?

A    They weren't there waiting. They showed up after I had gotten there.

Q    Okay.

A    And then I asked them to wait since I was transferring over the videotape to discs for them.

Q    Okay. And so once you got there did you advise them that you were there with the material?

A    Correct.

Q    Okay. And then they showed up and you gave it to them?

A    Yep.

Q      All right. Is there a paper trail for that transaction? Is
       that noted in your report, for example?

A      It should be on the last page of my report. The last page
       saying that the controlled substances and the video was
       handed over to Madison Heights.

Q      Okay. And so that was your notation of what you did?

A      Correct.

Q      Was that the end of your involvement in this case?

A      It was.

Q      Thank you, sir.

              THE COURT: Thank you, and Counsel, redirect?

                       REDIRECT EXAMINATION

BY MS. HAND:

Q      Just to be clear. Just to clarify. At what point I think
       you said you were given information about a stolen plate.
       Was it a stolen vehicle and you were given the plate
       number or was it a stolen plate?

A      I apologize, ma'am. It was a stolen vehicle.

Q      Stolen vehicle. Okay. Thank you. And that was confirmed
       before you made the stop?

A      Correct.

Q      Thank you.

              MS. HAND: No further questions.

              THE COURT: Thank you. You may step down.

              THE WITNESS: Yes, ma'am. Thank you.

                              21

(At 10:15 a.m., witness excused)

MS. HAND: No other witnesses, Judge. People rest.

THE COURT: Thank you. Counsel, any witnesses on behalf of defense?

MR. HOLMES: No, your Honor.

MS. HAND: Move to bind over, Judge. Reserve argument for rebuttal.

MR. HOLMES: Well, your Honor, this — with regard to the testimony that we heard today I would agree first that just based on that there are some factual issues that would be suited for determination in the Circuit Court by a finder of fact.

However, there are a lot of other issues involved with this particular case that haven't been disclosed in testimony today. I know the Court is probably aware of at least some of them regarding this. I mention this simply because with the particular charge that is here on the information and the testimony we had from Trooper McLean there is sufficient factual issues presented to bind it over. I just wanted to make sure that Mr. Witzke was aware that we're aware that there are other issues that can be dealt with in the Circuit Court regarding the foundational information we found today.

THE COURT: Thank you. The record should reflect that I have had a chance to hear the testimony in court

22

today. Based on the testimony of the witness as well as

the stipulation that was placed on the record there's

sufficient factual basis to bind the matter over to

Circuit Court as charged and I will do so.

       MS. HAND: Thank you, Judge.

       THE COURT: bond will be continued.

       * *  * * * * * * * * * *

CERTIFICATE

STATE OF MICHIGAN   )

COUNTY OF OAKLAND   )

I, Anne Nelson, CER 7483, do hereby certify I transcribed the
    foregoing hearing on a preliminary examination,
    consisting of 23 pages, is a complete, true, and
    accurate record of the proceedings and testimony
    taken in this case on Friday, February 14, 2020.


February 14, 2020     _____
                 Anne Nelson, CER 7483
                 47th District Court
                 31605 W. Eleven Mile Road
                 Farmington Hills, MI 48336
                 (248)871-2986